## AFFIDAVIT AND APPLICATION FOR SEARCH WARRANT

Your affiant, Raymond Padilla, a Task Force Officer with the Drug Enforcement Administration (DEA), being duly sworn, do hereby depose and state as follows:

### AFFIANT'S BACKGROUND

1.      Your affiant is an "investigative or law enforcement officer" within the meaning of Title 18, United States Code, Section 2510(7), and is authorized by law to conduct investigations and make arrests for offenses in Title 18, United States Code, Section 2516.

2.      Your affiant has been a Police Officer with the Westminster, Colorado, Police Department for approximately 16 years and is currently assigned to the North Metro Task Force and as a Task Force Officer (TFO) with the DEA Denver Division Office, Financial Intelligence Team, located in Centennial, Colorado.  For the past ten years, your affiant has been assigned to the North Metro Task Force, a multi-jurisdictional drug task force in the northern Denver metropolitan area.   Prior to the Westminster Police Department, your affiant was a Deputy Sheriff and Sergeant with the Summit County Sheriff's Office in Breckenridge, Colorado, and a Park Ranger with Colorado State Parks in Aurora, Colorado.   Cumulatively, your affiant has 21 years of law enforcement experience.  Your affiant has attended hundreds of hours of training, including DEA Basic Drug Investigators School, Money Laundering for Drug Investigations, Colorado Drug Investigators Association Training Summits, and numerous surveillance and undercover schools, which are related to intelligence analysis, financial crimes and money laundering, interview techniques, and the investigation of complex criminal organizations.

3.     Your affiant has received education and training from the Westminster Police Department, the North Metro Task Force, and the Drug Enforcement Administration. The education and training dealt with general criminal investigations as well as narcotics investigations.

4.     During your affiant's employment as a law enforcement officer, your affiant has performed the following tasks relevant to this search warrant:

a.     For the past 21 years, your affiant has participated in criminal investigations concerning persons and property crimes, including the use, manufacturing, cultivation and distribution of narcotics and marijuana.

b.     Your affiant has participated in interviewing witnesses, cooperating individuals, and informants regarding illegal trafficking in drugs and has read official reports of other officers who have conducted similar interviews.

c.     Your affiant has been a surveillance officer observing and recording movements of persons trafficking in drugs and those suspected of trafficking in drugs.

d.     Your affiant has functioned as a case agent in charge of numerous investigations of drug trafficking which included the use of wiretaps.

5.     Based on your affiant's experience, training, and discussions with other law enforcement officers experienced in drug investigations, your affiant knows that certain indicators exist when persons use residential homes for cultivating marijuana.  Indicators for homes that contain marijuana grows include, but are not limited to, the following:

a.     Homes used to grow marijuana are outfitted with dozens of high output lights and ballasts.  These lights create the artificial light that allow the process of

## AFFIDAVIT AND APPLICATION FOR SEARCH WARRANT

Your affiant, Raymond Padilla, a Task Force Officer with the Drug Enforcement Administration (DEA), being duly sworn, do hereby depose and state as follows:

## AFFIANT'S BACKGROUND

1.      Your affiant is an "investigative or law enforcement officer" within the meaning of Title 18, United States Code, Section 2510(7), and is authorized by law to conduct investigations and make arrests for offenses in Title 18, United States Code, Section 2516.

2.      Your affiant has been a Police Officer with the Westminster, Colorado, Police Department for approximately 16 years and is currently assigned to the North Metro Task Force and as a Task Force Officer (TFO) with the DEA Denver Division Office, Financial Intelligence Team, located in Centennial, Colorado.  For the past ten years, your affiant has been assigned to the North Metro Task Force, a multi-jurisdictional drug task force in the northern Denver metropolitan area.   Prior to the Westminster Police Department, your affiant was a Deputy Sheriff and Sergeant with the Summit County Sheriff's Office in Breckenridge, Colorado, and a Park Ranger with Colorado State Parks in Aurora, Colorado.   Cumulatively, your affiant has 21 years of law enforcement experience.  Your affiant has attended hundreds of hours of training, including DEA Basic Drug Investigators School, Money Laundering for Drug Investigations, Colorado Drug Investigators Association Training Summits, and numerous surveillance and undercover schools, which are related to intelligence analysis, financial crimes and money laundering, interview techniques, and the investigation of complex criminal organizations.

3.      Your affiant has received education and training from the Westminster Police Department, the North Metro Task Force, and the Drug Enforcement Administration. The education and training dealt with general criminal investigations as well as narcotics investigations.

4.      During your affiant's employment as a law enforcement officer, your affiant has performed the following tasks relevant to this search warrant:

a.      For the past 21 years, your affiant has participated in criminal investigations concerning persons and property crimes, including the use, manufacturing, cultivation and distribution of narcotics and marijuana.

b.      Your affiant has participated in interviewing witnesses, cooperating individuals, and informants regarding illegal trafficking in drugs and has read official reports of other officers who have conducted similar interviews.

c.      Your affiant has been a surveillance officer observing and recording movements of persons trafficking in drugs and those suspected of trafficking in drugs.

d.      Your affiant has functioned as a case agent in charge of numerous investigations of drug trafficking which included the use of wiretaps.

5.      Based on your affiant's experience, training, and discussions with other law enforcement officers experienced in drug investigations, your affiant knows that certain indicators exist when persons use residential homes for cultivating marijuana.  Indicators for homes that contain marijuana grows include, but are not limited to, the following:

a.      Homes used to grow marijuana are outfitted with dozens of high output lights and ballasts.  These lights create the artificial light that allow the process of

photosynthesis to occur and the marijuana plants to grow.  The lights use large amounts of electricity.  From training and experience, your affiant knows that average sized homes use 500 kWh to 1,500 kWh of electricity per month.  Based on home size, electrical usage in excess of 1,500 kWh per month is a very good indicator the home is being used to grow marijuana.  Your affiant knows, from training and experience, there are few reasons that can account for large amounts of electrical consumption in residential homes other than the use of lights, ballasts, high volume fans, and automated control and watering systems found in marijuana grows.  Because of this, marijuana grow homes can be easily identified by looking at utility billing records that list the monthly electrical usage.

b.      Some residential marijuana grow homes are not occupied.  The heat and humidity from the marijuana grow and the use of chemicals make the homes uncomfortable to be in for long periods of time.  The growers will generally harvest the marijuana or tend to the marijuana grow every few days.  Many operations involving marijuana grows are automated and run on timers.  Your affiant knows that surveillance establishing that homes are not being lived in or are visited infrequently is an indicator they are used to grow marijuana, particularly when there are elevated levels of electrical consumption.

c.      Your affiant knows marijuana grow homes seldom contain items of evidentiary value other than the marijuana plants and growing equipment.  The marijuana growers know the homes may be the target of law enforcement, search warrants, robberies, burglaries, and theft.  As a result, the growers will often keep finished marijuana

photosynthesis to occur and the marijuana plants to grow.  The lights use large amounts of electricity.  From training and experience, your affiant knows that average sized homes use 500 kWh to 1,500 kWh of electricity per month.  Based on home size, electrical usage in excess of 1,500 kWh per month is a very good indicator the home is being used to grow marijuana.  Your affiant knows, from training and experience, there are few reasons that can account for large amounts of electrical consumption in residential homes other than the use of lights, ballasts, high volume fans, and automated control and watering systems found in marijuana grows.  Because of this, marijuana grow homes can be easily identified by looking at utility billing records that list the monthly electrical usage.

b.      Some residential marijuana grow homes are not occupied.  The heat and humidity from the marijuana grow and the use of chemicals make the homes uncomfortable to be in for long periods of time.  The growers will generally harvest the marijuana or tend to the marijuana grow every few days.  Many operations involving marijuana grows are automated and run on timers.  Your affiant knows that surveillance establishing that homes are not being lived in or are visited infrequently is an indicator they are used to grow marijuana, particularly when there are elevated levels of electrical consumption.

c.      Your affiant knows marijuana grow homes seldom contain items of evidentiary value other than the marijuana plants and growing equipment.  The marijuana growers know the homes may be the target of law enforcement, search warrants, robberies, burglaries, and theft.  As a result, the growers will often keep finished marijuana

product, money from the illicit sale of marijuana, and documents related to the criminal enterprise at other locations that do not contain a marijuana grow.

d.      The odor of marijuana at a home is an excellent indicator the home is being used to grow marijuana plants.  Many residential marijuana grows will have the strong odor of marijuana that is easily detected from outside the home.  However, your affiant also knows from training and experience that great lengths are taken to construct marijuana grows so the odor of marijuana is contained inside the home or filtered out of the air.  This is done by using construction techniques that seal marijuana grow rooms making them air tight, using large commercial charcoal filters to remove the odor of marijuana, and using timers so the grow is vented at times the odor is less likely to be detected by neighbors and law enforcement.  These methods are often very effective at preventing the odor of marijuana from being detected outside the home.  Your affiant has personally been in marijuana grows associated with the DTOs described in this affidavit that contained 500 to 1,000 marijuana plants and the odor of marijuana could not be detected outside the home.  Furthermore, your affiant has been inside several of these homes that contain basement marijuana growing operations, and the odor was barely detectable inside the main level of the home.  Your affiant has also observed odor absorbing substances near doors, windows, and throughout the homes that absorb odor and produce a fragrance that appears meant to mask marijuana odor.

e.      Marijuana cultivators observed in this investigation have also taken additional steps to shield their marijuana grows from the public and law enforcement by installing high quality surveillance camera equipment that focus on the front and rear of

the property, making it difficult for law enforcement to approaching the home closely and detect the odor of marijuana.

      f.    Your affiant knows the refuse from marijuana grow homes contains evidence related to the cultivation of marijuana.  However, marijuana cultivators will often purposely not use residential trash services to dispose of marijuana cultivation refuse. Refuse with evidence of marijuana cultivation is commonly removed and taken to the landfill, disposed of in dumpsters in public shopping centers, or deposited in trash cans which are taken out just prior to the scheduled pick-up time.  All these counter-measures are done to avoid law enforcement detection of homes used to grow marijuana.

      g.    Based on this investigation and prior investigations of this drug trafficking organization, your affiant also is aware that some marijuana growers will tap into electrical lines prior to the residential service meter to avoid paying extremely high costs for electrical use.  Most power diversions encountered during this investigation involve a hole being bored into the concrete basement foundation wall directly underneath or near the external residential service meter.  These main electrical lines are tapped into and run directly into the marijuana grow, thus avoiding detection by law enforcement or the utility company.

      h.    Statutorily in Colorado any residential marijuana grow is limited to 12 plants.  Under Colorado law, it is also illegal to cultivate or possess marijuana that is intended to be distributed or to sell marijuana except by state licensed and regulated businesses. The individuals identified in this drug trafficking organization further described in this affidavit are in violation of both Federal and State criminal statutes.

6.     During the course of your affiant's participation in numerous investigations, a variety of investigative techniques and resources, including physical and electronic surveillance and various types of informants and cooperating sources have been used. As a result of these investigations, training and experience, and conversations with other agents and law enforcement personnel, your affiant has become familiar with the methods used by traffickers to: smuggle and safeguard narcotics, distribute narcotics, and collect and launder the proceeds generated by their sale, manufacture, and distribution.   In addition, your affiant has learned that narcotics traffickers use various types of electronic communication devices to code, encrypt, conceal, and maintain records in order to facilitate their drug trafficking activities.   Through this training and experience your affiant has further learned:

a.     That persons involved in large-scale drug trafficking conceal, in various locations, caches of drugs, drug paraphernalia, deeds to property, and other items of value and/or proceeds of drug transactions and evidence of financial transactions relating to obtaining, transferring, secreting, or spending large sums of money acquired from narcotics trafficking activities;

b.     That drug traffickers often maintain (in either physical or electronic format): negotiable monetary instruments, transaction ledgers, U.S. currency, virtual currency (Bitcoin, Ethereum, etc) narcotic supplier lists, correspondence, narcotics-related notations, logs, receipts, journals, books, records, and other documents noting the price, quantity, and/or times when narcotics were obtained, transferred, sold, distributed, and/or concealed.   Your affiant knows that drug traffickers also maintain drug

6

paraphernalia such as weighing devices, marijuana cultivation paraphernalia, miscellaneous containers, and measuring devices, which are used to facilitate the distribution and/or consumption of narcotics;

       c.     That drug traffickers earn large sums of money and often try to legitimize these large sums of money.  In order to do this, narcotics traffickers attempt to secrete, transfer, and conceal the illicit money by; 1) placing assets in names other than their own to avoid detection while maintaining control; 2) hiding the money (and related documents) in businesses, safes and associated bank accounts and safe-deposit boxes; 3) using the money to buy assets that are difficult to trace; 4) depositing and commingling drug proceeds with legitimate funds in an effort to conceal the drug proceeds.

       d.     That drug traffickers engaged in money laundering, and frequently retain records of their transactions within their places of business.  These records may be in the form of written notes and correspondence, receipts, negotiated instruments, contracts, bank statements, electronic communications, and other records.

       e.     That drug traffickers engaged in money laundering often maintain such records for long periods of time, particularly when they are involved in ongoing criminal conduct over a long period of time.  Based on my experience and review of the cases *United States v. Thomas*, 605 F.3d 300 (6th Cir. 2010), and *United States v. Greany*, 929 F2d 523 (9th Cir. 1991), the Ninth Circuit and other courts have held that, where there is an ongoing criminal business of a necessarily long term nature, the passage of long periods of time will not make the evidence supporting the issuance of a warrant stale.

f.      There are many reasons drug traffickers maintain evidence for long periods of time.  The evidence may be innocuous at first glance (e.g. financial, credit card and banking documents, travel documents, receipts, documents reflecting purchases of assets, personal calendars, telephone and address directories, check books, videotapes and photographs, utility records, ownership records, letters and notes, tax returns and financial records, escrow files, telephone bills, keys to safe deposit boxes, packaging materials, and computer hardware and software), but have significance and relevance when considered in light of other evidence.  The drug trafficker may no longer realize he/she still possesses the evidence or may believe law enforcement could not obtain a search warrant to seize the evidence.  The drug trafficker may also be under the mistaken belief that he/she has deleted, hidden, or further destroyed any computer-related evidence.  However, that evidence may still be retrievable by a forensic computer expert.

g.      Net worth/source and application of funds analysis can often show that a suspect's known expenditures and/or accumulation of assets substantially exceeds his or her legitimate sources of income, thus providing evidence that the suspect is engaged in illegal activities (such as narcotics trafficking or fraud) which result in the generation of monetary proceeds.  The net worth analysis compares a suspect's net worth (cost value of total assets minus total liabilities) at a time just before the suspect has commenced his purported criminal enterprise with his/her net worth at the approximate time of his/her arrest (and potentially at intervals in the interim).  The source and application of funds analysis focuses on the suspect's expenditures during the time period of the purported illegal activities and compares such expenditures with his/her legitimate

sources of income.  Both analyses require evaluation of bank records, credit records, loan records, documents evidencing ownership of assets, and other documents evidencing the financial profile of the suspect during the course of the purported illegal activity, as well as a short time period prior to the illegal activity (e.g., one year).  Such analysis evidences changes in lifestyle, asset accumulation, and expenditures between the time period prior to the illegal activity and the time period of the illegal activity.  This can provide evidence of profit-generating illegal activities (e.g., narcotics trafficking or fraud), as compared to a person earning income from legitimate sources.  Evidence of a defendant's expenditures, asset accumulation, financial life-style, net worth/source and application of funds analyses, and underlying financial documents necessary for such analyses are admissible evidence under Federal and State case law in narcotic trafficking and money laundering cases.  This establishes the need for such documents to be taken during the execution of a search warrant.

h.      Narcotics traffickers are not unlike other members of society in that they rely on credit and debit cards to make financial payments.  Records relating to the use of such cards can provide valuable information to the investigation by showing the amount of money that is being spent by the suspects, and it may further identify businesses that are associated with the illegal activities of the suspects.

i.      Narcotics traffickers deal in currency and store currency in conveyances, homes, safe deposit boxes, safes, and at business sites to conduct transactions.  Furthermore, the Currency Transaction Report (CTR) (IRS Form 4789) is required to be completed and filed with the Internal Revenue Service by all financial

institutions on every currency transaction that exceeds $10,000.  This requirement causes tremendous problems for narcotics traffickers when they attempt to negotiate their illegal profits at financial institutions because these reports can be made available to law enforcement officials.  It is quite common for individuals who deal in illegal controlled substances to convert drug proceeds (currency) into cashier's checks and or money orders in amounts less than $10,000 at numerous financial institutions over the course of several days in order to avoid the CTR filing requirement.   Furthermore, narcotics traffickers often recruit other individuals to convert drug proceed currency for them in order to avoid handling the currency themselves.  Finally, it is not uncommon for narcotics traffickers to endeavor to circumvent these requirements and "legitimize" their funds through casinos, documenting their "winnings" in an attempt to show an additional source of income;

j.       That narcotics traffickers use financial habits designed to minimize and hide a paper trail.  Traffickers often purchase and/or title their assets in fictitious names, aliases, or in the names of relatives, friends, associates, or business entities to avoid detection of these assets by government agencies, especially the Internal Revenue Service.  Regardless of documented ownership, the drug traffickers continue to use these assets and exercise control over them;

k.       Individuals who deal in illegal controlled substances take or cause to be taken photographs of themselves, their associates, their property, and their illegal product.  These individuals usually maintain these photographs in their possession or in businesses, where they have access and control.  Locations related to the distribution of

controlled substances often maintain surveillance systems which frequently store and maintain evidence of ongoing illegal activity and criminal associations. Such footage provides valuable evidence regarding their daily operations.

l. Narcotics traffickers often engage in domestic and/or international travel in relation to the smuggling of illegal contraband. Specifically, individuals involved in maintaining marijuana grow and distribution operations in Colorado often engage in interstate or international travel for the purpose of obtaining supplies, distributing their product, and/or speaking with investors and associates. Analysis of travel records can reveal other locations related to the distribution of illegal narcotics or the payment of related proceeds. Furthermore, evidence of travel can also assist in the identification of assets and/or monetary expenditures associated with the illegal proceeds of narcotics transactions.

7. The information contained within this affidavit is based on your affiant's training and experience, as well as information imparted to me by other law enforcement officers involved in this investigation. Because this affidavit is being submitted for the limited purpose of securing search warrants, each and every fact known concerning this investigation has not been included. This document contains only the facts believed necessary to establish probable cause that evidence, fruits, and instrumentalities of violations of Title 21, United States Code, Section 841(a)(1), as specified in Attachment B of this affidavit, are located at the TARGET LOCATION described in Attachment A of this affidavit.

## Current Investigation

8.      During the summer of 2016, your affiant and investigators from the North Metro Task Force began investigating a network of marijuana cultivators involved in the cultivation and distribution of large amounts of marijuana.  This investigation determined the overall network was actually several smaller DTOs that work together to cultivate marijuana in Colorado and distribute the marijuana outside the State of Colorado.

9.      To date, approximately 227 residential and business search warrants have been executed on 221 residences and six businesses.  Of the 227 searched locations, 118 were in Adams County, 58 in Arapahoe County, one in Broomfield County, six in Denver County, four in Douglas County, three in El Paso County, 15 in Jefferson County, and 22 in Weld County.

10.      These warrants have resulted in the seizure of approximately 67,000 marijuana plants and 4,500 pounds of finished marijuana product.  Through the execution of these warrants, your affiant has observed the majority of the marijuana grow homes have been specially constructed to contain and mask the odor of growing marijuana.  The marijuana grows are generally set up in the basement of the homes in sealed rooms made of foam backer board and lumber.  Large commercial charcoal air filters are used to filter the air and remove the odor of marijuana.  It is also common for the marijuana grows to only be vented late at night to prevent investigators and neighbors from detecting the marijuana odor.  The techniques used to construct these rooms makes detecting the odor of marijuana from outside the home very difficult.

11.     Several of the search warrants executed by investigators revealed the marijuana growers will commonly bypass the electrical meter in marijuana grow homes. To date, approximately five percent of the searched homes had bypassed electrical meters. Bypassing the electrical meter greatly decreases the amount of electricity for which a marijuana grow home is billed.  This is done to make it more difficult for law enforcement to identify a marijuana grow home based on elevated electrical usage data. It also greatly benefits the marijuana cultivator by lowering their monthly electrical bill.  In large residential marijuana grows, without bypassing, it is common to have a monthly electrical bill ranging from $1,000 to $2,000.

12.     Investigators have tried on several occasions to detect the odor of marijuana at numerous locations during this investigation, although marijuana odor was not detected.  Your affiant believes this is due to the construction techniques used by this drug trafficking organization by creating sealed, air-tight rooms.  These air-tight rooms, used in conjunction with large commercial air filters, make the detection of marijuana from outside the home nearly impossible.  This has been observed by your affiant as well as other investigators participating in this investigation.

13.     Investigators have not recovered refuse from the **TARGET LOCATION** primarily because the trash cans either are not placed at the curbside or are placed at the curb immediately before the garbage truck arrives and then immediately returned to the garages. In your affiant's opinion, attempts by agents to collect garbage under these circumstances would carry a high risk of disclosure and would have compromised the investigation.

14.     A tremendous amount of counter surveillance has been detected during the investigation of this drug trafficking organization including video and audio doorbells affixed to the residences as well as surveillance cameras located on various parts of the homes. Many of these cameras and video doorbell systems are remotely monitored and can be monitored by multiple individuals at the same time.  Continually approaching the residences to attempt to detect the odor of marijuana could compromise the investigation as well as investigators and their vehicles.

15.     Investigators have utilized many types of investigatory tools including open source public records and law enforcement database searches to learn the criminal associates and associated residences of this drug trafficking organization, which has been extremely beneficial and productive.  As new addresses were identified, many were revealed to be marijuana cultivation locations based on power usage records and other information.  The use of open source public records were also utilized frequently to identify additional residences associated to case targets, vehicles and other residences involved in this DTO.

### Surveillance

16.     On November 9, 2017, North Metro Task Force investigators were conducting surveillance at **635 Tumbleweed Drive, Brighton, Colorado,** and observed a 2018 Honda Ridgeline, Colorado license EXQ054, parked at the residence.   This vehicle is registered to Jonathan TRAN at **635 Tumbleweed Drive, Brighton, Colorado**. While conducting surveillance, investigators ultimately followed the Honda Ridgeline to

6645 W Bayaud Avenue in Lakewood, Colorado, at which point surveillance was terminated.

17.     On January 2, 2019, through the pole camera at Pao Pao II, which is a grow store that sells equipment for marijuana grows, investigators observed a gray Honda van, bearing Colorado license SON343, in the loading bay.  The van is registered to Nai LI at 4856 Mt Shavano Street, Brighton, Colorado.  Prior to leaving, the vehicle was loaded with pots commonly used to grow marijuana.  Detective Streno and NMTF Detectives Whipple and Thwaits responded to 4856 Mt Shavano Street, Brighton, Colorado, and observed the odor of marijuana emanating from the residence and bamboo sticks near the front door. Based on training and experience, including the search warrants executed in this investigation to date, your affiant knows that bamboo sticks are commonly used to help stabilize the marijuana plants as they grow.  Shortly after arriving at 4856 Mt Shavano Street, Detective Thwaits observed the van arrive at the residence and enter the garage, with the door closing behind. Open source public records, including CLEAR, showed several additional addresses associated with 4856 Mt Shavano Street, namely 9916 W 99th Place, Broomfield, Colorado, 10069 Granby Drive, Commerce City, Colorado, and 25839 E Bayaud Avenue, Aurora, Colorado.

## SEARCH WARRANT EXECUTION JANUARY 31, 2019

18.     On January 31, 2019, DEA and NMTF investigators executed a Federal search warrant at 25839 E Bayaud Avenue, Aurora, Colorado.  No one was present. Upon entry to the residence, investigators located a large marijuana grow in the basement of the residence consisting of 151 live marijuana plants, which were seized along with the

growing equipment, which consisted of 39 light/ ballast combinations and three additional ballasts.  During a search of the residence, investigators also located mail addressed to Jonathan TRAN at **635 Tumbleweed Drive, Brighton, Colorado**.

19.     A CLEAR inquiry revealed that Christy NGUYEN and Jonathan TRAN may live at this residence.   Christy NGUYEN was the subscriber for power at **635 Tumbleweed Drive**.

20.     On May 7, 2019, NMTF Detective Kevin Hathaway responded to the **635 Tumbleweed Drive** to conduct surveillance.  Upon arrival, Detective Hathaway noted no vehicles at the address, a Ring brand doorbell affixed to the house, and the odor of marijuana emanating from the residence.

21.     On May 15, 2019, Detective Hathaway returned to **635 Tumbleweed Drive** and took a photograph of the residence.  The photograph depicts the same 2018 Honda Ridgeline truck, Colorado license EQX054, observed on November 9, 2017, as noted in paragraph 19, above.

## ELECTRICAL ANALYSIS

## 25839 E BAYAUD AVENUE, AURORA, COLORADO

22.     Property records show that this residence is owned by Kimviu THAN.  Xcel Energy records show that this residence used 7,662 kWh of electricity during the 33-day period prior to execution of the search warrant on January 31, 2019.  The electrical subscriber was Christy NGUYEN.  A review of these records indicates between July 20, 2018, and December 19, 2018, the average monthly usage was 6,529 kWh, which is significantly more than the 500 kWh to 1,500 kWh used by a residence of average and

comparable size. The historical power consumption at this residence shows this residence had been a marijuana cultivation location since at least May 2018.

### 635 TUMBLEWEED DRIVE, BRIGHTON, COLORADO

23.     Property records show that this residence is owned by Kimviu THAN. United Power records show that this residence used 10,835 kWh of electricity during the most recent 30-day period.   The electrical subscriber for this address is also Christy NGUYEN.   A review of these records indicates between April 2018 and April 2019, the average monthly usage was 10,204 kWh, which is significantly more than the 500 kWh to 1,500 kWh used by a residence of average and comparable size. The historical power consumption at this residence shows this residence has been a marijuana cultivation location since at least April 2018.   Between April 2018 and April 2019, power usage has remained elevated and consistent.   Based on training and experience, your affiant believes this residence contains a marijuana grow.

24.     As described above and in Attachment B, this application seeks permission to search and seize business records, banking records, financial documents, ledgers, emails, text messages, application based chat logs, photographs and other electronic documents that contain evidence of the Drug Trafficking Organization conspiracy to cultivate and distribute marijuana and crimes related to money laundering.   These items will likely be found in the **TARGET LOCATION**, in the form of paper or electronic medium. Your affiant submits that if a computer or electronic medium is found on the premises, there is probable cause to believe those records will be stored in that computer or electronic medium, for at least the following reasons:

a.    Based on your affiant's knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted or viewed via the Internet. Electronic files downloaded to a hard drive can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using readily available forensics tools.  When a person "deletes" a file on a home computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data.

b.    Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the hard drive that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.    Similarly, files that have been viewed via the Internet are typically automatically downloaded into a temporary Internet directory or "cache." The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

d.    Based on actual inspection of spreadsheets, financial records, invoices, payroll records, and other business related documentation, your affiant is aware that computer equipment was used to generate, store, and print documents used in the money laundering and drug trafficking activities of the this DTO.  There is reason to believe that

there are computer systems currently located at the **TARGET LOCATION** containing this information.

25. In some instances, your affiant does not know all of the persons that may reside or frequent the **TARGET LOCATION**. Because of this, it is possible that the **TARGET LOCATION** will contain computers that are predominantly used, and perhaps owned, by persons who are not suspected of a crime. If agents conducting the search nonetheless determine that it is possible that the things described in this warrant could be found on those computers, this application seeks permission to search and if necessary to seize those computers as well. It may be impossible to determine, on scene, which computers contain the things described in this warrant.

26. Based upon your affiant's knowledge, training and experience, I know that searching for information stored in computers often requires agents to seize most or all electronic storage devices to be searched later by a qualified computer expert in a laboratory or other controlled environment. This is often necessary to ensure the accuracy and completeness of such data, and to prevent the loss of the data either from accidental or intentional destruction. Additionally, to properly examine those storage devices in a laboratory setting, it is often necessary that some computer equipment, peripherals, instructions, and software be seized and examined in the laboratory setting. This is true because of the following:

e. The volume of evidence. Computer storage devices (like hard disks or CD-ROMs) can store the equivalent of millions of pages of information. Additionally, a suspect may try to conceal criminal evidence; he or she might store it in random order with

deceptive file names. This may require searching authorities to peruse all the stored data to determine which particular files are evidence or instrumentalities of crime. This sorting process can take weeks or months, depending on the volume of data stored, and it would be impractical and invasive to attempt this kind of data search on-site.

        f.    Technical requirements. Searching computer systems for criminal evidence sometimes requires highly technical processes requiring expert skill and properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert is qualified to analyze the system and its data. In any event, however, data search processes are exacting scientific procedures designed to protect the integrity of the evidence and to recover even "hidden," erased, compressed, password- protected, or encrypted files. Because computer evidence is vulnerable to inadvertent or intentional modification or destruction (both from external sources or from destructive code imbedded in the system as a "booby trap"), a controlled environment may be necessary to complete an accurate analysis.

        27.    In light of these concerns, your affiant hereby request the Court's permission to seize the computer hardware (and associated peripherals) that are believed to contain some or all of the evidence described in the warrant, and to conduct an off-site search of the hardware for the evidence described, if, upon arriving at the scene, the agents executing the search conclude that it would be impractical to search the computer hardware on-site for this evidence.  Your affiant requests the Courts permission that if

needed due to technical limitations, the computers and electronic medium may be sent outside the District of Colorado to a qualified laboratory, where the items will be searched.

28.     Searching computer systems for the evidence described in Attachment A may require a range of data analysis techniques. In some cases, it is possible for agents and analysts to conduct carefully targeted searches that can locate evidence without requiring a time-consuming manual search through unrelated materials that may be commingled with criminal evidence. In other cases, however, such techniques may not yield the evidence described in the warrant. Criminals can mislabel or hide files and directories, encode communications to avoid using key words, attempt to delete files to evade detection, or take other steps designed to frustrate law enforcement searches for information. These steps may require agents and law enforcement or other analysts with appropriate expertise to conduct more extensive searches, such as scanning areas of the disk not allocated to listed files, or peruse every file briefly to determine whether it falls within the scope of the warrant. In light of these difficulties, the DEA intends to use whatever data analysis techniques appear necessary to locate and retrieve the evidence described in Attachment A.

29.     Based on the above described events, your affiant submits that there is probable cause to believe that the **TARGET LOCATION** listed in Attachment A is being used to cultivate, store, and sell illegal marijuana, in violation of Title 21, U.S.C., Section 841(a)(1) and U.S. Currency gained from the illegal sale narcotics.

30.     Based on the foregoing, I further submit that there is probable cause to believe that: (1) evidence of such crimes, (2) contraband, fruits of crime, or other items

illegally possessed, and (3) property designed for use, intended for use, or used in committing a crime will be located at the **TARGET LOCATION**.

31.   WHEREFORE, I respectfully request a search warrant for the **TARGET LOCATION**, including all out buildings, detached garages and vehicles located on the curtilage of the properties.

*s/Raymond Padilla*
Raymond Padilla, Task Force Officer
Drug Enforcement Administration

SUBMITTED, attested to, and acknowledged by reliable electronic means this 21st day of May, 2019, at Denver, Colorado.

BY THE COURT:

HONORABLE NINA Y. WANG
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF COLORADO

**Reviewed and submitted by AUSA Barbara S. Skalla.**